## NATIONAL ELECTRICAL MANUFACTURERS ASSOCIATION

v.

**William H. SORRELL, as Attorney General of the State Vermont, and John Kassel, as Secretary, Vermont Agency of Natural Resources.**

### No. Civ. 1:99CV203.

United States District Court,
D. Vermont.

Nov. 8, 1999.

Geoffry W. Crawford, O'Neill, Crawford & Green, P.C., Burlington, VT, for appellant.

Ronald A. Shems, Office of Vermont Attorney General, Montpelier, VT, for appellee.

## RULING ON MOTION FOR PRELIMINARY INJUNCTION

MURTHA, Chief Judge.

### I. Introduction

Recently enacted, 10 V.S.A. § 6621d(a) requires manufacturers of mercury-containing light bulbs (hereinafter also referred to as "lamps") to place certain labels on their lamps and packaging. Through this suit, the National Electrical Manufacturers Association (hereinafter "NEMA") seeks to have this Court declare Vermont's labeling requirement unconstitutional in that it violates its members' civil rights under the First Amendment, the Commerce Clause and the Supremacy Clause of the United States Constitution.

NEMA has moved for a preliminary injunction which would prohibit the defendants from enforcing § 6621d(a) and the regulations promulgated thereunder. For the reasons set forth below, the plaintiff's Motion for Preliminary Injunction is GRANTED.[1]

---

1. The instant ruling only addresses the plaintiff's claims under the Commerce Clause and First Amendment. The Court renders no opinion on any other claim encompassed in plaintiff's complaint.

## II. Background

The record before the Court includes testimony presented at a hearing conducted on September 22, 23 and 24, 1999, as well as admissible evidence presented in the form of affidavits and exhibits. *See Davis v. New York City Hous. Auth.*, 166 F.3d 432, 437–38 (2d Cir.1999) ("[W]hile affidavits may be considered on a preliminary injunction motion, motions for preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact."). Upon review of the present record and the testimony presented, the Court finds the following as relevant to the disposition of the plaintiff's Motion for Preliminary Injunction. *See* Fed.R.Civ.P. 65(a)(2) ("[A]ny evidence received upon an application for preliminary injunction which would be admissible upon the trial on the merits becomes part of the record on the trial and need not be repeated upon the trial.")

The plaintiff, NEMA, is a trade association that includes lamp manufacturers whose lamps are sold in Vermont and nationwide. The defendants, Vermont Attorney General William Sorrell and Vermont Secretary of the Agency of Natural Resources (hereinafter "the Agency") John Kassel are responsible for administration and enforcement of the labeling statute at issue.

The volume of testimony presented and evidence submitted reveals the parties actually dispute very little. No one disputes mercury is a toxic substance, exposure to which can result in serious impacts on human health and the environment. No one disputes that some lamps manufactured and distributed by NEMA's members contain mercury. No one disputes that certain consumers should be encouraged to use mercury-containing lamps because they are more energy-efficient than regular incandescent bulbs, thereby reducing needed energy production and the emission of pollutants into the environment. No one disputes Vermont has an interest in reducing the amount of mercury which finds its way into the environment. The only substantial dispute is whether Vermont's mercury labeling law, 10 V.S.A. § 6621d(a), furthers the goal of reducing the amount of mercury in the environment in a way that is consistent with Constitutional prohibitions against excessive state interference with a commercial entity's rights to engage in interstate commerce and free speech.

In relevant part, section 6621d(a) provides:

Effective March 1, 2000, a manufacturer or wholesaler may not sell at retail in this state, to a retailer in this state, or for use in this state, and the retailer may not knowingly sell, any of the following items at retail if they contain mercury added during the manufacture, unless the item is labeled. The label must clearly inform the purchaser or consumer that mercury is present in the item and that the item may not be disposed of or placed in the waste stream destined for disposal until the mercury is removed and reused, recycled, or otherwise managed to ensure that it does not become part of solid waste or wastewater. Primary responsibility for affixing labels required under this section shall be on the manufacturer, and not on the wholesaler, or retailer ... Items to be labeled are: ... A lamp.

Pursuant to section 6621d(f), the Agency of Natural Resources promulgated rules and standards for labeling mercury-added products. Section 6–803(b) of the Agency's Solid Waste Management Rules ("SWMR") provides:

(1) The label must clearly inform the purchaser or consumer that mercury is present in the item and that the item may not be disposed of or placed in a waste stream designed for disposal until the mercury is removed and reused, recycled, or otherwise managed to ensure that mercury does not become part of solid waste or wastewater.

(2) A label must be clearly visible and legible to consumers prior to purchase of the product. The label must be located on a surface of the product that is visible during installation and removal.

(3) For labels affixed to products, the required words or symbols must be printed, mounted, molded, or engraved on the surface of the product using materials sufficiently durable to remain legible for the useful life of the product.

(4) For products with enclosed mercury-added switches, both the enclosed device and the larger product must be labeled.

(5) A listed mercury-added consumer product must be labeled if manufactured after July 1, 1999 [as amended by statute, March 1, 2000].

(6) Primary responsibility for affixing the required labels shall be on the manufacturer, and not on the wholesaler or retailer.

SWMR section 6–803(c) provides for an alternative labeling procedure:

The Secretary may administratively authorize alternative labeling, including package labeling, for mercury-added consumer products listed in Subsection 6–803(a)(2) above under the following conditions:

(1) A manufacturer must submit a written request for alternative labeling documenting that a product or class of products cannot reasonably be labeled to comply with specific requirements of Subsections 6–803(a) and/or (b) above.

(2) All authorizations for alternative labeling granted under this Subsection will be limited in duration and may be renewed.

The vast majority of lamps subject to Vermont's labeling requirement fall into three broad categories: (1) elongated fluorescent lamps of the type widely used in retail, residential, office and industrial locations; (2) compact fluorescent lamps, which are similar in size and use to conventional incandescent bulbs; and (3) high-intensity discharge lamps, also referred to as HID lamps, which are designed to be especially energy-efficient. Currently 11 manufacturers, most of which are NEMA members, make 4800 varieties of mercury-containing lamps for sale in Vermont.

The lamps are manufactured in a variety of places world-wide, including Europe, Asia, and South America. After manufacture, the lamps are shipped to central distribution centers which serve large regions. For example, a distribution center in Florida may supply retailers on the entire east coast. It is impossible to predict whether any particular lamps will eventually end up on a particular retailer's shelf either in Vermont or anywhere else in the United States.

Approximately 1.1 million lamps per year are sold in Vermont. This figure represents about .02% of total lamp sales in the United States.

Accordingly, it is virtually certain that any manufacturer which plans to sell lamps in Vermont will have to label all lamps it produces to comply with the labeling law. As a practical matter, it appears manufacturers will either refrain from selling mercury-containing lamps in Vermont or will have to label all bulbs manufactured world-wide with the Vermont-required label. It is apparent that labeled bulbs which find their way to jurisdictions other than Vermont will cause confusion in that they identify the product as a hazardous waste which must be recycled. However, no jurisdiction has established recycling facilities for mercury-containing lamps, a factor which may discourage potential purchasers from buying these admittedly energy-efficient bulbs.[2]

Prior to instituting this suit, NEMA and the Agency apparently engaged in unsuccessful attempts to resolve this matter. In particular, the Agency rejected NEMA's offer to meet new statutory obligations by

---

2. Curiously, even Vermont has yet to identify its plan to recycle mercury-containing bulbs.

At this time, only electric utilities in Minnesota provide recycling services.

only providing informational and warning signs for Vermont retailers to post at the point-of-purchase.

Accordingly, at this time, it appears the Agency will require manufacturers of mercury-containing lamps to permanently etch their bulbs with the symbol "Hg" in a circle, a marking which no other state or nation requires. "Hg" is the abbreviation on the periodic table for mercury. In addition, the Agency plans to require manufacturers to place on the lamp packaging an explanation that "Hg" means "mercury" and the following instruction: "If Purchased in Vermont—Don't Put in Trash—Recycle or Dispose of as Hazardous Waste."

As with other types of hazardous materials which require recycling or disposal in special facilities, the consuming public must be informed and educated as to the need for disposal of these products other than in landfills. No law requiring labeling of a hazardous substance will prove effective unless users realize the dangers associated with placing these materials in the general waste stream and are provided alternative sites for disposal by the government or private industry.

Absent an extensive education campaign, the symbol "Hg" will be meaningless to most consumers. The state, in fact, plans to undertake an extensive, yet to date poorly defined, campaign to educate consumers about mercury and the proper disposal of mercury-containing products. All marketing experts, including the defendants', stressed that any campaign directed to consumers must influence the consumer's decision at the time of disposal of the product. Yet, given the fact that there is likely a lapse of many years between lamp purchase and lamp disposal, it is unclear why an informational campaign solely geared to consumers at the time of disposal would not be equally or more effective than a labeling scheme which relies on information contained on a package which will be thrown away many years

before a consumer must dispose of the lamp itself.

In addition, NEMA, through its experts, has presented credible evidence that the symbol "Hg," together with any explanatory note on the packaging, will be ignored on already cluttered bulb packaging at the time of purchase. In addition, at the end of a lamp's useful life, the symbol "Hg," without packaging that was thrown away years before, will be rendered irrelevant.

NEMA cites a variety of problems when arguing its members cannot reasonably and economically comply with the new law and attendant regulations. Some lamps are too small to accommodate the logo the Agency requires. It is also a problem to affix a logo that lasts the life of the lamp so that the consumer can see it at the time of disposal.

Moreover, NEMA has presented evidence suggesting the cost of compliance will be substantial. To place the "Hg" logo on all lamps would require manufacturers to make millions of dollars worth of alterations to their assembly lines. The costs potentially could exceed the total revenue from lamp sales in Vermont. NEMA member General Electric, for example, estimates having to incur an initial cost of approximately $8 million to alter its production lines to affix the required labeling and produce packaging, plus annual compliance costs of an addition $4.7 million. NEMA further claims a total of 196 production lines in 60 member and non-member plants located world-wide would need to be altered to comply with Vermont's law. Finally, the costs of these changes would be passed on to consumers, possibly raising the price of already more-expensive mercury-containing lamps.

The state disputes the cost of compliance estimates tendered by NEMA's experts. At this point, the Court need not credit any particular estimate in order to find the cost of alterations to a manufacturer's production line would be substantial in that it would require manufacturers either to stop selling in Vermont, to

change its distribution system to isolate bulbs going to Vermont, or to label all lamps to comply with Vermont law.

Another substantial problem with the Vermont labeling law is that, even if the law were to operate as envisioned, it only addresses, at great cost to manufactures and increased price to consumers, a very small portion of the problem of mercury entering the environment. Power plants, especially those which burn coal, emit most of the mercury currently making its way into the environment. No coal burning plants are located in Vermont, and Vermont's labeling law will have no effect on mercury originating in other states.

At the preliminary injunction hearing, the defendants showed some manufacturers of mercury-containing lamps currently label their product as containing "low mercury" and are thus "safer for the environment." From this, they conclude: "Surely, if manufacturers can label and package lamps as low-mercury, they can also label and package them as containing mercury." Defendants' Memorandum and Affidavits in Opposition to Plaintiff's Motion for a Preliminary Injunction (paper 16) at 21. Of course, the issue is not whether NEMA members are able to label their products; the issue is, whether under the circumstances present in this case and consistent with the Constitution, the defendants can require them to label their products.

### III. Discussion

█ A party seeking injunctive relief ordinarily must show: (a) it will suffer irreparable harm in the absence of an injunction; and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Polymer Tech. Corp. v. Mimran,* 37 F.3d 74, 77–78 (2d Cir.1994); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam). The plaintiff has based its request for injunctive relief on a demonstration of irreparable harm and a likelihood of success on the merits. *See* Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction (paper 3) at 23–24.

### A. Irreparable Harm

It is often noted that, because monetary injury can be estimated and compensated, such injury ordinarily does not constitute irreparable harm. "However, a perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the position they previously occupied." *Brenntag Int'l Chemicals, Inc. v. Bank of India,* 175 F.3d 245, 249 (2d Cir.1999). That is the case here. Even should the plaintiff ultimately prevail here, it could not recover any funds expended in complying with Vermont's mercury labeling law because the state defendants are protected by the Eleventh Amendment.

█ Furthermore, the Vermont labeling law impinges on the plaintiff's First Amendment rights in that it "indisputably requires them to speak when they would rather not." *International Dairy Foods Ass'n v. Amestoy,* 92 F.3d 67, 72 (2d Cir. 1996). Accordingly, for purposes of awarding preliminary injunctive relief in the instant case, the plaintiff has demonstrated irreparable harm. *See Tom Doherty Assoc., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 38 (2d Cir.1995) (irreparable harm exists where there is a threatened imminent loss that will be very difficult to quantify at trial).

### B. Likelihood of Success on the Merits

#### 1. Commerce Clause

The Commerce Clause grants to Congress the power "[t]o regulate commerce ... among the several States." U.S. CONST. art. 1, § 8. It also limits a state's power to enact statutes which establish

barriers to interstate trade. *See Lewis v. BT Inv. Managers, Inc.,* 447 U.S. 27, 35, 100 S.Ct. 2009, 64 L.Ed.2d 702 (1980). As the Supreme Court has explained:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970) (citation omitted).

■ Here, the problem with Vermont's labeling law is that it is not narrowly-tailored, and its burdens are clearly excessive in relation to the asserted local benefits. In effect, the law requires lamp manufacturers to label all lamps, even those not destined for Vermont. Moreover, the "Hg" label itself, virtually certain to be present without explanation at the time of disposal, promises to be meaningless absent an extensive public relations campaign designed to educate the public. In this regard, the defendants have not persuasively explained why the manufacturers' offer to provide point-of-sale informational signs in retail stores which inform about proper disposal of mercury-containing lamps would not, standing alone, be equally as effective. In short, the state could meet its goal by doing away with its onerous labeling requirements and focusing on educating consumers at the time of disposal and by providing recycling facilities similar to those already available for products such as glass and metal cans.

"Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst.,* 491 U.S. 324, 336–37, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). "[T]he practical effect of the statute must be evaluated not only considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* at 336, 109 S.Ct. 2491. By proposing a labeling scheme which essentially requires lamp manufactures to label all lamps in conformity with Vermont law, Vermont is presuming to legislate outside its own boundaries. There is only so much information which can be placed on lamps and packaging. Because of spatial limitations, any other state which may want to control the disposal of mercury-containing lamps by insisting on a different message would either have to abandon a labeling proposal or choose to be bound by Vermont's legislated message.

### 2. First Amendment

■ "Commercial speech" is entitled to protection under the First Amendment. *See Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 637, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). The First Amendment protects both the freedom to speak and the freedom not to speak. *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 559, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985).

> In Commercial speech cases, then, a four-part analysis has developed. At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and wheth-

er it is not more extensive than is necessary to serve that interest.

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York,* 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).

■ Vermont also has failed to meet its burden of justifying this labeling law under the First Amendment. *See International Dairy Foods,* 92 F.3d at 72. By far, the largest source of mercury in the environment does not come from lamps. On the present record, it is little more than speculation as to whether the Vermont labeling law will be more effective than point-of-purchase signs, point-of-disposal signs, or other educational methods. *See Edenfield v. Fane,* 507 U.S. 761, 770, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). Undoubtedly, the state has a substantial interest in protecting the health and safety of its citizens and environment by reducing mercury emissions. However, it may only use means that "directly advance" the asserted interest. *See Zauderer,* 471 U.S. at 638, 105 S.Ct. 2265. The problem with the labeling law at issue is its requirements are far more extensive than is necessary to advance the state's legitimate interests.

### Conclusion

The Motion for a Preliminary Injunction is GRANTED. The defendants are hereby ordered to cease from attempting to enforce 10 V.S.A. § 6621d(a), and any rules and regulations promulgated thereunder, insofar as they require the labeling of mercury-containing lamps or their packaging.

⸱ SO ORDERED.