**NATIONAL ELECTRICAL MANU-FACTURERS ASSOCIATION, Plaintiff–Appellee,**

v.

**William H. SORRELL, Attorney General of the State of Vermont, John Kassel, Vermont Agency of Natural Resources, Defendants–Appellants,**

---

Conservation Law Foundation, Inc., Vermont Public Interest Research Group, Vermont Natural Resources Council, Inc., National Wildlife Federation, Lake Champlain Committee, New Hampshire, State of, New Hampshire Department of Environmental Services, Mercury Policy Project, Movants.

Docket No. 99–9450.

United States Court of Appeals, Second Circuit.

Argued July 12, 2000.

Decided Nov. 6, 2001.

Ronald A. Shems, Assistant Attorney General, (William H. Sorrell, Attorney General, Rebecca Ellis, Dianne H. Sanford, Assistant Attorneys General, on the brief), Montpelier, VT, for defendants-appellants.

Steven J. Rosenbaum, Covington & Burling (Anthony J. Vlatas, on the brief), Washington, DC, and Geoffrey W. Craw-

ford, O'Neill, Crawford & Green, Burlington, VT, for plaintiff-appellee.

Bernard D. Lambek, Paterson & Walke, Montpelier, VT, for movants.

Maureen F. Leary, Assistant Attorney General of the State of New York (Eliot Spitzer, Attorney General, Preeta D. Bansal, Solicitor General, Daniel Smirlock, Deputy Solicitor General, Christopher Amato, Maureen F. Leary, Assistant Attorneys General, on the brief), Albany, NY, for amici curiae States of New York, Alaska, California, Connecticut, Maine, Massachusetts, Minnesota, New Hampshire, New Jersey, New Mexico, and Oklahoma.

Before WALKER, Chief Judge,
POOLER and SOTOMAYOR, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge:

Defendants-appellants William H. Sorrell, Attorney General of the State of Vermont, and John Kassel, Secretary of the Vermont Agency of Natural Resources ("Vermont defendants"), appeal from a preliminary injunction imposed by the United States District Court for the District of Vermont (J. Garvan Murtha, *Chief District Judge*) barring enforcement of a Vermont labeling statute as it applies to manufacturers of mercury-containing light bulbs. Because we find that plaintiff-appellee National Electrical Manufacturers Association ("NEMA") failed to show a likelihood of success on the merits of its Commerce Clause and First Amendment claims, we vacate the preliminary injunction and remand for further proceedings.

## BACKGROUND

In 1998, the Vermont Legislature enacted a statute, Vt. Stat. Ann. tit. 10, § 6621d(a), that requires manufacturers of some mercury-containing products to label their products and packaging to inform consumers that the products contain mercury and, on disposal, should be recycled or disposed of as hazardous waste.[1] Among the products so regulated are mercury-containing flourescent light bulbs, denominated as "lamps" in subsection (5) of section 6621d(a). The Vermont Agency of Natural Resources has promulgated a rule to implement the labeling requirement. *See* Vt.Code R. 12–036–003, § 6–803.

On July 27, 1999, NEMA, on behalf of its lamp-manufacturer members, sued the Vermont defendants claiming, among other things, that both the statute and its underlying regulations violate NEMA's

---

1. Section 6621d(a) reads, in relevant part, as follows:

 Effective March 1, 2000, a manufacturer or wholesaler may not sell at retail in this state, to a retailer in this state, or for use in this state, and a retailer may not knowingly sell, any of the following items at retail if they contain mercury added during manufacture, unless the item is labeled. The label must clearly inform the purchaser or consumer that mercury is present in the item and that the item may not be disposed of or placed in a waste stream destined for disposal until the mercury is removed and reused, recycled, or otherwise managed to ensure that it does not become part of solid waste or wastewater. Primary responsibility for affixing labels required under this section shall be on the manufacturer, and not on the wholesaler or retailer.... Items to be labeled are:

 (1) A thermostat or thermometer.
 (2) A switch, individually or as part of another product.
 (3) A medical or scientific instrument.
 (4) An electric relay or other electrical device.
 (5) A lamp.
 (6) A battery, sold to the public, other than a button battery.

 Vt. Stat. Ann. tit. 10, § 6621d(a). Vermont also prohibits the disposal of "[l]abeled mercury-added consumer products" in solid waste landfills. *See* Vt. Stat. Ann. tit. 10, § 6621a(a)(7).

members' rights under the United States Constitution's Commerce Clause and First Amendment. Following an extended hearing, the district court, on November 8, 1999, preliminarily enjoined the defendants from enforcing section 6621d(a) and its accompanying regulations, finding that NEMA had demonstrated irreparable harm and a likelihood of success on the merits. *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 72 F.Supp.2d 449, 456 (D.Vt.1999) (hereinafter "*NEMA*"). According to the district court, NEMA was irreparably harmed because (1) if NEMA ultimately prevailed, the state defendants would be shielded by the Eleventh Amendment from damages claims, and thus NEMA's members could not recover money spent to comply with the statute, and (2) the statute infringed NEMA's First Amendment rights by forcing its members to speak. *Id.* at 454.

The district court determined that NEMA had demonstrated a likelihood of success on the merits of its Commerce Clause claim because (1) the statute's burdens outweighed its benefits, and (2) as a practical matter, Vermont was regulating conduct that would occur entirely beyond its borders. *Id.* at 454–55. The district court also found that Vermont was unable to justify the labeling law under the First Amendment. *Id.* at 455–56.

The Vermont defendants appealed. The State of New York filed an amicus brief in support of the appeal, joined by the States of Alaska, California, Connecticut, Maine, Minnesota, New Hampshire, New Jersey, New Mexico, and Oklahoma.

## DISCUSSION

Insofar as pertinent to our disposition, the Vermont defendants argue in support of section 6621d(a) that, in finding a likelihood of success on the merits, the district court erred (1) by applying heightened scrutiny under the Commerce Clause to a nondiscriminatory statute and balancing a hypothetical label against hypothetical costs, and (2) by applying heightened scrutiny to the First Amendment compelled speech claim. The amici argued in addition that the labeling law was authorized by Congress in the federal hazardous waste management statute, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, and thus the state statute is not vulnerable to challenge under the Commerce Clause. Because we conclude that NEMA has not demonstrated a likelihood of success on the merits of its Commerce Clause and First Amendment claims, we vacate the injunction.

## I. Commerce Clause

■ A statute may violate the well-established "dormant" aspect of the Commerce Clause, U.S. Const. art. I, § 8, cl. 3, in one of two ways: it may clearly discriminate against interstate commerce, in which case it is virtually invalid per se, *see Wyoming v. Oklahoma*, 502 U.S. 437, 454, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992), or even if it does not evince such discriminatory effect, it may still be unconstitutional if it imposes a burden on interstate commerce incommensurate with the local benefits secured, *see Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). NEMA argues that section 6621d violates the Commerce Clause in the latter manner. We disagree and thus conclude that NEMA cannot show likely success on the merits of its Commerce Clause claim.

■ In *Pike*, the Supreme Court adopted a balancing test to determine whether state statutes that incidentally burden interstate commerce violate the Commerce Clause. The Court held that

[w]here the statute regulates even-handedly to effectuate a legitimate local pub-

lic interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Id.* (citations omitted). For a state statute to run afoul of the *Pike* standard, the statute, at a minimum, must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce. *See Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 75 (2d Cir.1998); *Gary D. Peake Excavating Inc. v. Town Bd. of Town of Hancock,* 93 F.3d 68, 75 (2d Cir.1996) (quoting *N.Y. State Trawlers Ass'n v. Jorling,* 16 F.3d 1303, 1308 (2d Cir.1994)); *USA Recycling, Inc. v. Town of Babylon,* 66 F.3d 1272, 1287 (2d Cir.1995); *see also Pac. Northwest Venison Producers v. Smitch,* 20 F.3d 1008, 1015 (9th Cir.1994); *Old Bridge Chem., Inc. v. N.J. Dep't of Envtl. Prot.,* 965 F.2d 1287, 1295 (3d Cir.1992); *K S Pharmacies, Inc. v. Am. Home Prods. Corp.,* 962 F.2d 728, 731 (7th Cir.1992). Under *Pike,* if no such unequal burden be shown, a reviewing court need not proceed further.

■ The focus of our disparate burden analysis is a state's shifting the costs of regulation to other states. *See S.C. State Highway Dep't v. Barnwell Bros.,* 303 U.S. 177, 184–85 n. 2, 58 S.Ct. 510, 82 L.Ed. 734 (1938) ("State regulations affecting interstate commerce, whose purpose or effect is to gain for those within the state an advantage at the expense of those without, or to burden those out of the state without any corresponding advantage to those within, have been thought to impinge upon the constitutional prohibition even though Congress has not acted."); *see also* 2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure* § 11.7, at 150 (3d ed.1999); Laurence H. Tribe, *American Constitutional Law* § 6–5, at 409 (2d ed.1988). Such circumstances raise the risk that state policymakers will not bear the true political costs of their decisions, because those costs will fall in some measure on the residents of other political jurisdictions. *See S. Pac. Co. v. Arizona,* 325 U.S. 761, 767–68 n. 2, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945) ("[T]he Court has often recognized that to the extent that the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected."); *S.C. State Highway Dep't,* 303 U.S. at 185 n. 2, 58 S.Ct. 510. Accordingly, the justification for judicial intervention in the absence of congressional action may outweigh the strong tradition of judicial deference to legislative decisions, *see* 2 Rotunda & Nowak, *supra,* § 11.11; Tribe, *supra,* § 6–15, at 411, and the strain on judicial competence imposed by comprehensive cost/benefit balancing, *cf. CTS Corp. v. Dynamics Corp. of Am.,* 481 U.S. 69, 95, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987) (Scalia, J., concurring in part and concurring in the judgment) (stating that "such [a balancing] inquiry is ill suited to the judicial function and should be undertaken rarely if at all").

While several types of burdens on interstate commerce would qualify as "disparate" to trigger *Pike* balancing, *see, e.g., Pac. Northwest Venison Producers,* 20 F.3d at 1015, NEMA cites two in particular in this case: (1) control of commerce that occurs wholly beyond the state's borders; and (2) risk of imposing regulatory

requirements inconsistent with those of other states. Regulations that fall into the first category may be said to have extraterritorial operation, while those in the second may be said to create interstate regulatory conflicts.

### A. Extraterritoriality.

■ A regulation may disproportionately burden interstate commerce if it has the practical effect of requiring out-of-state commerce to be conducted at the regulating state's direction. *See, e.g., Healy v. Beer Inst.,* 491 U.S. 324, 332, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989); *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.,* 476 U.S. 573, 582, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). *Healy* and *Brown–Forman Distillers* involved efforts by a state to control the prices at which goods are sold in the state by pegging them to the lowest price charged for the same goods in other states. The effect of those price-regulation statutes on commerce in foreign states was inescapable: they "necessarily require[d] out-of-state commerce to be conducted according to in-state terms." *Cotto Waxo Co. v. Williams,* 46 F.3d 790, 794 (8th Cir.1995).

■ Given the manufacturing and distribution systems used by its members, NEMA argues that, if its members continue selling in Vermont, they would also be forced as a practical matter to label lamps sold in every other state. The district court agreed [2] and concluded that Vermont was "presuming to legislate outside its own boundaries." *NEMA,* 72 F.Supp.2d at 455. We disagree.

NEMA's extraterritoriality contention fails because the statute does not inescapably require manufacturers to label all lamps wherever distributed. The Vermont statute, by its terms, is "indifferent" to whether lamps sold anywhere else in the United States are labeled or not. *See, e.g., Cotto Waxo Co.,* 46 F.3d at 794. Unlike the restrictions involved in the Supreme Court's price-regulation cases, the statute here makes no mention of other states for any purpose. *See* Vt. Stat. Ann. tit. 10, § 6621d(a). To the extent the statute may be said to "require" labels on lamps sold outside Vermont, then, it is only because the manufacturers are unwilling to modify their production and distribution systems to differentiate between Vermont-bound and non-Vermont-bound lamps.

To avoid the statute's alleged impact on other states, lamp manufacturers could arrange their production and distribution processes to produce labeled lamps solely for the Vermont market and then pass much of the increased costs along to Vermont consumers in the form of higher prices. This fact distinguishes the present case from the Supreme Court's price regulation cases. In cases like *Healy,* the state necessarily prevented firms from recouping any of the costs imposed by the state statute from the residents of the state itself. Here, the manufacturers remain free to charge higher prices only to Vermonters without risking violation of the statute.

To be sure, manufacturers will rarely be able to fully pass through to consumers the costs of a new tax or regulation. A lamp manufacturer's ability to pass costs along depends on the price elasticity of demand for lamps: the more responsive demand is to changes in price, the more added costs the manufacturer will be

---

**2.** More precisely, the district court found that the potential costs of compliance "would require manufacturers either to stop selling in Vermont, to change [their] distribution system to isolate bulbs going to Vermont, or to label all lamps to comply with Vermont law." *NEMA,* 72 F.Supp.2d at 453–54.

forced to absorb. But that manufacturers must bear some of the costs of the Vermont regulation in the form of lower profits does not cause the statute to violate the Commerce Clause. Such a burden is simply attributable to legitimate intrastate regulation. The manufacturers are not required to adhere to the Vermont rule in other states.

It is possible, as the district court suggested, that the cost of labeling lamps solely for the Vermont market might cause them to be prohibitively expensive. *See NEMA*, 72 F.Supp.2d at 453. In other words, the demand for lamps in Vermont may be such that their increased price would *so severely reduce consumption* that the lamps could no longer be sold profitably in Vermont. In that event, lamp manufacturers might be compelled by economic necessity to withdraw from the Vermont market altogether.[3]

NEMA's lament that Vermont's labeling requirement violates the Commerce Clause because it effectively forces manufacturers not to sell lamps in Vermont is nonetheless unpersuasive for three reasons. First, it is axiomatic that the increased cost of complying with a regulation may drive up the sales price of the product and thus erode demand for the product such that production becomes unprofitable. Consequently, any regulation may drive some or all producers or distributors from the regulating state. But in every such case, a decision to abandon the state's market rests entirely with individual manufacturers based on the opportunity cost of capital, their individual production costs, and what the demand in the state will bear. Because none of these variables is controlled by the state in this case, we cannot say that the choice to stay or leave has been made for manufacturers by the state legislature, as the Commerce Clause would prohibit. Although a regulation might violate the Commerce Clause by creating market incentives that encourage out-of-state manufacturers to abandon a state market while encouraging in-state manufacturers to pick up the slack, the instant regulation is evenhanded such that lamp producers both inside and outside Vermont would face the same putative need to develop separate production and distribution systems to accommodate simultaneously the Vermont market and other state markets.

Second, the manufacturers' choice to discontinue Vermont sales would not amount to a special, disproportionate injury to interstate commerce of the sort required by our precedents. If lamp manufacturers were to withdraw from the Vermont market, only Vermont residents would feel any appreciable effect, in the lost utility of mercury-bearing bulbs. Any loss felt by residents of other states would be minor by comparison.

The considerations here are quite different from those in cases cited by NEMA that involve state restrictions on interstate transporters. *See, e.g., Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520,

---

**3.** The costs of manufacturing lamps solely for the Vermont market appear, at the moment, to be quite high. Such increased costs need not be permanent, however: the marketplace would reward manufacturers who can reduce those costs and thus sell lamps more cheaply than their competitors. As a result, we are skeptical that NEMA's present cost estimates capture the true costs of labeling over time

and that those costs will force all lamp manufacturers from the Vermont market. *Cf. Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) (holding that "interstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one interstate supplier to another").

79 S.Ct. 962, 3 L.Ed.2d 1003 (1959); *S. Pac. Co.*, 325 U.S. at 775, 65 S.Ct. 1515. Transporters forced either to abide by state rules or avoid the state entirely would necessarily be impeded, if they chose the latter course, in their efforts to conduct commerce with the surrounding states because they would be unable to pass through the regulating state. That sort of distinct interstate burden is not presented in this case, however.

Finally, NEMA directs to the wrong forum its complaint that manufacturers will choose not to sell in Vermont. The risk that the labeling requirement would erode manufacturers' profits and thus encourage them to abandon the state is an appropriate consideration for the Vermont legislature, not the federal courts. Whether the unavailability of mercury-bearing lamps in the state redounds to the benefit of state residents is a question that the political branches of the State of Vermont were entitled to decide. *See Exxon Corp.*, 437 U.S. at 128, 98 S.Ct. 2207 ("It may be true that the consuming public will be injured by [the effect of the challenged regulation], but again that argument relates to the wisdom of the statute, not to its burden on commerce."); *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir.1995) (noting that the Commerce Clause does not protect the citizens of a state against the questionable wisdom of decisions made by their own lawmakers).

B. Interstate Regulatory Conflicts.

 NEMA also contends that the statute burdens interstate commerce by exposing its members to the possibility of multiple, inconsistent labeling requirements imposed by other states. A state regulation might impose a disproportionate burden on interstate commerce if the regulation is in substantial conflict with a common regulatory scheme in place in other states. *See Raymond Motor Transp.*, 434 U.S. at 445, 98 S.Ct. 787; *Bibb*, 359 U.S. at 529–30, 79 S.Ct. 962; *Silver v. Woolf*, 694 F.2d 8, 14 (2d Cir.1982). *But cf.* Donald H. Regan, *Siamese Essays: (I) CTS Corp. v. Dynamics Corp. of America and Dormant Commerce Doctrine; (II) Extraterritorial State Legislation*, 85 Mich. L.Rev. 1865, 1883 (1987) (suggesting that inconsistent regulation as a dormant Commerce Clause problem may be "limited to transportation cases"). It is not enough to point to a risk of conflicting regulatory regimes in multiple states; there must be an actual conflict between the challenged regulation and those in place in other states. *See Silver*, 694 F.2d at 14; *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 406, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994) (O'Connor, J., concurring) ("This is not a hypothetical inquiry."); *Procter & Gamble Co. v. City of Chicago*, 509 F.2d 69, 77 (7th Cir.1975) ("The Supreme Court has indicated that in a case involving environmental legislation it is actual conflict, not potential conflict, that is relevant.").

No such conflict has been shown here. NEMA concedes that no other state even regulates the labeling of mercury-bearing bulbs, much less does so in conflict with Vermont's approach. Indeed, there is record evidence that the Vermont statute is consistent with regimes under consideration by other states. While the scope of conflict required to state a dormant Commerce Clause claim is somewhat unclear, it is clear that the present case involves no conflict whatsoever.

C. Additional Considerations.

Were we to adopt NEMA's theory of the Commerce Clause, we would constitutionalize policy choices legitimately in the hands of Congress. Whatever the policy

reasons may be in support of a nationally uniform regulatory framework for mercury-containing products, such a framework is not compelled by the Commerce Clause. "The idea that there is a general interest in [regulatory] uniformity is inconsistent with our [society's] decision to have separate states with separate legislative competencies, including separate competences to regulate commerce." Regan, *supra*, at 1881. Such policy considerations appropriately rest with Congress, not the federal courts.

We therefore find persuasive the fact that Congress's principal effort to rationalize waste management-the Resource Conservation and Recovery Act-expressly leaves individual states with flexibility to adopt regulations more stringent than those imposed by the federal government. *See* 42 U.S.C. § 6929 ("Nothing in this [statute] shall be construed to prohibit any State or political subdivision thereof from imposing any requirements ... which are more stringent than those imposed by [the federal program]."). We have held that a federal statute's authorization of supplementary state regulation "confers upon [the state regulations], if not a shield, at least a sturdy buffer against [a] Commerce Clause [challenge]." *Grocery Mfrs. of Am. v. Gerace*, 755 F.2d 993, 1005 (2d Cir.1985). Although we do not think RCRA's savings provision is sufficient to shield completely the Vermont statute from dormant Commerce Clause scrutiny, *cf. Wyoming*, 502 U.S. at 458, 112 S.Ct. 789 (holding that "Congress must manifest its unambiguous intent before a federal statute will be read to permit or to approve ... a violation of the Commerce Clause"), Congress's enactment of § 6929 bolsters our conclusion that the Commerce Clause's "dormant" implication does not invalidate the Vermont statute.

## II. First Amendment

■ In granting the preliminary injunction, the district court concluded that NEMA had also shown likely success on the merits of its First Amendment claim because section 6621d(a) "impinges on [NEMA's] First Amendment rights in that it 'indisputably requires them to speak when they would rather not.'" *NEMA*, 72 F.Supp.2d at 454 (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 72 (2d Cir.1996) (hereinafter "*IDFA*")). The district court held that the statute's "requirements are far more extensive than is necessary to advance the state's legitimate interests" and implied that the statute failed to "directly advance" those interests. *Id.* at 456. We think that the district court misperceived the proper standard to apply in this case and conclude that, when the proper standard is applied, the Vermont statute passes First Amendment muster.

■ NEMA concedes that only commercial speech is at issue in this case. Commercial speech is subject to "less stringent constitutional requirements" than are other forms of speech. *IDFA*, 92 F.3d at 72. Furthermore, within the class of regulations affecting commercial speech, there are "material differences between [purely factual and uncontroversial] disclosure requirements and outright prohibitions on speech." *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). Regulations that compel 'purely factual and uncontroversial' commercial speech are subject to more lenient review than regulations that restrict accurate commercial speech and will be sustained if they are 'reasonably related to the State's interest in preventing deception of consumers.' *Id.* at 651, 105 S.Ct. 2265.

■ Commercial disclosure requirements are treated differently from re-

strictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests.[4] Such disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the "marketplace of ideas." Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal. In such a case, then, less exacting scrutiny is required than where truthful, nonmisleading commercial speech is restricted. *See 44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 501, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996); *Zauderer,* 471 U.S. at 650–51, 105 S.Ct. 2265; Robert Post, *The Constitutional Status of Commercial Speech,* 48 U.C.L.A. L.Rev. 1, 28 (2000).

Additionally, the individual liberty interests guarded by the First Amendment, which may be impaired when personal or political speech is mandated by the state, *see W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), are not ordinarily implicated by compelled commercial disclosure, *cf. Riley v. Nat'l Fed'n of the Blind of N.C.,* 487 U.S. 781, 796 n. 9, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (holding that "[p]urely commercial speech is more susceptible to compelled disclosure requirements" than is personal or political speech). Required disclosure of accurate, factual commercial information presents little risk that the state is forcing speakers to adopt disagreeable state-sanctioned positions, suppressing dissent, confounding the speaker's attempts to participate in self-governance, or interfering with an individual's right to define and express his or her own personality.[5] *See* Post, *supra,* at 27.

We recognize that compelled disclosure of truthful, factual information might also trench on privacy concerns. Courts have accorded less weight to those concerns, however, in commercial settings and to corporate plaintiffs than where an individual's personal privacy is involved. *See, e.g., United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950); *United States v. McFillin,* 713 F.2d 57, 60 (4th Cir.1981); *Am. Future Sys., Inc. v. Pa. State Univ.,* 688 F.2d 907, 915–16 (3d Cir.1982). To the extent commercial speakers have a legally cognizable interest in withholding accurate, factual information, that interest is typically accommodated by the common law of property and its constitutional guarantors. *See, e.g., Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1003–04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (discussing protection of trade secrets under the Fifth Amendment's Takings Clause).

In sum, mandating that commercial actors disclose commercial information ordi-

---

**4.** NEMA has not argued on appeal that the Vermont label is inaccurate. Indeed, they would be hard-pressed to do so, given that (1) the labeled items in fact do contain mercury; and (2) consumers are prohibited by law from disposing of "[l]abeled mercury-added consumer products" with ordinary solid waste, *see* Vt. Stat. Ann. tit. 10, § 6621a(a)(7).

**5.** Our decision reaches only required disclosure of factual commercial information. Re-

quiring actors in the marketplace to espouse particular opinions would likely raise issues not presented here. *See Zauderer,* 471 U.S. at 651, 105 S.Ct. 2265 (upholding advertising regulation that did not "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein" (internal quotation marks omitted)).

narily does not offend the important utilitarian and individual liberty interests that lie at the heart of the First Amendment. The Amendment is satisfied, therefore, by a rational connection between the purpose of a commercial disclosure requirement and the means employed to realize that purpose. *See Zauderer*, 471 U.S. at 651, 105 S.Ct. 2265. The Vermont statute meets this test.

Vermont's interest in protecting human health and the environment from mercury poisoning is a legitimate and significant public goal. The district court did not believe otherwise, but concluded that the Vermont statute was insufficiently precise in producing the desired ends. We believe that the district court did not appreciate the requisite connection between means and ends in a compelled commercial disclosure case such as this.

*Zauderer*, not *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), describes the relationship between means and ends demanded by the First Amendment in compelled commercial disclosure cases. The *Central Hudson* test should be applied to statutes that *restrict* commercial speech.[6]

To be sure, the compelled disclosure at issue here was not intended to prevent "consumer confusion or deception" per se, *Zauderer*, 471 U.S. at 651, 105 S.Ct. 2265 (internal quotation marks omitted), but rather to better inform consumers about the products they purchase. Although the overall goal of the statute is plainly to reduce the amount of mercury released into the environment, it is inextricably intertwined with the goal of increasing consumer awareness of the presence of mercury in a variety of products. Accordingly, we cannot say that the statute's goal is inconsistent with the policies underlying First Amendment protection of commercial speech, described above, and the reasons supporting the distinction between compelled and restricted commercial speech. We therefore find that it is governed by the reasonable-relationship rule in *Zauderer*.

We believe that such a reasonable relationship is plain in the instant case. The prescribed labeling would likely contribute directly to the reduction of mercury pollution, whether or not it makes the greatest possible contribution. It is probable that some mercury lamp purchasers, newly informed by the Vermont label, will properly dispose of them and thereby reduce mercury pollution. By encouraging such changes in consumer behavior, the labeling requirement is rationally related to the state's goal of reducing mercury contamination.

We find that the Vermont statute is rationally related to the state's goal, notwithstanding that the statute may ultimately fail to eliminate all or even most mercury pollution in the state. Accordingly, although we do not take issue with the district court's finding that "the largest source of mercury in the environment does

---

**6.** Although we applied the *Central Hudson* test in *IDFA*—which addressed a Vermont regulation requiring dairy producers to label dairy products derived from cows treated with recombinant Bovine Somatotropin (rBST)—our decision was expressly limited to cases in which a state disclosure requirement is supported by no interest other than the gratification of "consumer curiosity." *IDFA*, 92 F.3d at 73. The disclosure statute at issue here, however, is based on Vermont's substantial interest in protecting human health and the environment from mercury poisoning. Moreover, because our decision in IDFA was predicated on the state's inability to identify a sufficient legitimate state interest, we did not reach the proper relationship between a disclosure regulation's means and its ends, the issue we face here.

not come from lamps," *NEMA,* 72 F.Supp.2d at 456, we ascribe different legal significance to it. In essence, the district court found the Vermont statute to be unconstitutionally underinclusive, because it "does not get at all facets of the problem it is designed to ameliorate." *Zauderer,* 471 U.S. at 652 n. 14, 105 S.Ct. 2265. This analysis misses the mark. States are not bound to follow any particular hierarchy in addressing problems within their borders, as long as the state's response does not trench on fundamental rights. *See id.* The Supreme Court has held that "[t]he right of a commercial speaker not to divulge accurate information regarding his services is not such a fundamental right." *Id.* Absent interference with such a fundamental right, a state may choose to tackle a subsidiary cause of a problem rather than its primary cause, particularly where that primary cause lies out of its reach-for example, where the cause lies in the interstate transport of air pollutants from out-of-state, upwind power plants. *See NEMA,* 72 F.Supp.2d at 454 ("Power plants, especially those which burn coal, emit most of the mercury currently making its way into the environment. No coal burning plants are located in Vermont. . . .").

Finally, we note the potentially wide-ranging implications of NEMA's First Amendment complaint. Innumerable federal and state regulatory programs require the disclosure of product and other commercial information. *See, e.g.,* 2 U.S.C. § 434 (reporting of federal election campaign contributions); 15 U.S.C. § 78*l* (securities disclosures); 15 U.S.C. § 1333 (tobacco labeling); 21 U.S.C. § 343(q)(1) (nutritional labeling); 33 U.S.C. § 1318 (reporting of pollutant concentrations in discharges to water); 42 U.S.C. § 11023 (reporting of releases of toxic substances); 21 C.F.R. § 202.1 (disclosures in prescription drug advertisements); 29 C.F.R. § 1910.1200 (posting notification of workplace hazards); Cal. Health & Safety Code § 25249.6 ("Proposition 65"; warning of potential exposure to certain hazardous substances); N.Y. Envtl. Conserv. Law § 33–0707 (disclosure of pesticide formulas). To hold that the Vermont statute is insufficiently related to the state's interest in reducing mercury pollution would expose these long-established programs to searching scrutiny by unelected courts. Such a result is neither wise nor constitutionally required.

## CONCLUSION

Because NEMA has failed to show a likelihood of success on the merits of either of its Commerce Clause or First Amendment claims, the preliminary injunction is vacated, and the case is remanded. Costs of the appeal will be borne by the appellees.